# 13-1837(L)

## 13-1917(CON)

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 13-1837(L), 13-1917(CON)

➤•◆•➤

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

TODD NEWMAN, ANTHONY CHIASSON,

*Defendants-Appellants,*

JON HORVATH, DANNY KUO, HYUNG G. LIM,
MICHAEL STEINBERG,

*Defendants.*

───────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PETITION OF THE UNITED STATES OF AMERICA
## FOR REHEARING AND REHEARING *EN BANC*

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*

SARAH E. MCCALLUM,
ROBERT W. ALLEN,
HARRY A. CHERNOFF,
MICHAEL A. LEVY,
  *Assistant United States Attorneys,
    Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  Disclosure of Inside Information
        at Dell . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    B.  Disclosure of Inside Information
        at NVIDIA . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    C.  Proceedings Below and the Opinion . . . . . .  7

ARGUMENT:

POINT I—The Panel's Constricted Definition of
    "Personal Benefit" Conflicts with Prior
    Decisions of the Supreme Court, Other
    Circuits, and this Court . . . . . . . . . . . . . . . . . .  10

POINT II—Under the Previously Existing and
    Correct Personal Benefit Standard, the
    Evidence Was Sufficient To Support
    the Convictions . . . . . . . . . . . . . . . . . . . . . . . .  15

    A.  The Evidence Was Sufficient to Establish
        that the Insiders Personally Benefitted
        from Their Improper Disclosures of
        Inside Information . . . . . . . . . . . . . . . . . . .  16

    B.  The Evidence Was Sufficient to Establish
        that the Defendants Knew, Or Consciously
        Avoided Knowing, that the Insiders
        Personally Benefitted . . . . . . . . . . . . . . . . .  19

ii

PAGE

POINT III—The Panel's Definition of Personal
    Benefit Threatens the Integrity of the
    Securities Markets . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

*Cases:*

*Dirks* v. *SEC*,
    463 U.S. 646 (1983). . . . . . . . . . . . . . . . . . . *passim*

*SEC* v. *Downe*,
    969 F. Supp. 149 (S.D.N.Y. 1997) . . . . . . . . . . . 13

*SEC* v. *Maio*,
    51 F.3d 623 (7th Cir. 1995) . . . . . . . . . . . . . . . . 12

*SEC* v. *Rocklage*,
    470 F.3d 1 (1st Cir. 2006). . . . . . . . . . . . . . . . . . 12

*SEC* v. *Warde*,
    151 F.3d 42 (2d Cir. 1998) . . . . . . . . . . . . . . . 12, 13

*United States* v. *Chavez*,
    549 F.3d 119 (2d Cir. 2008) . . . . . . . . . . . . . . . . 15

*United States* v. *Ekinci*,
    101 F.3d 838 (2d Cir. 1996) . . . . . . . . . . . . . . . . 19

*United States* v. *Evans*,
    486 F.3d 315 (7th Cir. 2007) . . . . . . . . . . . . 12, 14

*United States* v. *Ford*,
    703 F.3d 708 (4th Cir. 2013) . . . . . . . . . . . . . . . 19

iii

PAGE

*United States* v. *Goffer*,
    721 F.3d 113 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 21

*United States* v. *Hassan*,
    578 F.3d 108 (2d Cir. 2008) . . . . . . . . . . . . . . . . 19

*United States* v. *Jiau*,
    734 F.3d 147 (2d Cir. 2013) . . . . . . . . . . . . . . . 9, 12

*United States* v. *Libera*,
    989 F.2d 596 (2d Cir. 1993) . . . . . . . . . . . . . . . . 24

*United States* v. *O'Hagan*,
    521 U.S. 642 (1997). . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Robison*,
    505 F.3d 1208 (11th Cir. 2007) . . . . . . . . . . . . . 19

*United States* v. *Whitman*,
    904 F. Supp. 2d 363 (S.D.N.Y. 2012) . . . . . . . . . 13

*Statutes, Rules & Other Authorities:*

17 C.F.R. § 243.100 . . . . . . . . . . . . . . . . . . . . . . . . . 21

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket Nos. 13-1837(L), 13-1917(CON)

────────────

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

TODD NEWMAN, ANTHONY CHIASSON,

*Defendants-Appellants,*

JON HORVATH, DANNY KUO, HYUNG G. LIM,
MICHAEL STEINBERG,

*Defendants.*

────────────

## PETITION OF THE UNITED STATES OF AMERICA
## FOR REHEARING AND REHEARING *EN BANC*

────────────

### Preliminary Statement

On December 10, 2014, this Court issued an opinion in this matter (the "Opinion") (Parker, Winter, and Hall, C.JJ.) (the "Panel") that reversed the insider trading convictions of Todd Newman and Anthony Chiasson (the "defendants"). The Opinion breaks with Supreme Court and Second Circuit precedent, conflicts with the decisions of other circuits, and threatens the effective enforcement of the securities laws.

2

First, seizing on an issue raised briefly by only one defendant, the Opinion redefines a critical element of insider trading liability—the requirement that the insider-tipper have acted for a "personal benefit"—in a manner that: (i) runs contrary to *Dirks* v. *SEC*, 463 U.S. 646 (1983), the decision that first established the personal benefit requirement; (ii) conflicts with decisions of other circuits, and, indeed, prior decisions of this Court; and (iii) conflicts with the definition accepted by all parties and relied upon by the District Court below. Even on its own terms, the new definition is deeply confounding and, contrary to the Panel's express intention of supplying clarity, is certain to engender confusion among market participants, parties, judges, and juries.

Second, applying this new and incorrect definition of personal benefit, and holding for the first time that a culpable tippee must *know* that the insider-tipper who supplied the inside information acted for such a benefit (a requirement the Government argued against, but does not challenge herein), the Panel erroneously ordered dismissal of the charges against the tippee-defendants in this case. Specifically, the Panel held that the Government's evidence was insufficient to prove that the defendants knew the insider-tippers had acted for a personal benefit, and, indeed, insufficient even to prove that the insider-tippers had acted for a personal benefit at all. These unfounded conclusions led the Panel to deny the Government the opportunity to retry its case in light of the newly announced knowledge requirement.

3

The Panel's missteps will have serious consequences far beyond this case. Put simply, if the Opinion stands, the Panel's erroneous redefinition of the personal benefit requirement will dramatically limit the Government's ability to prosecute some of the most common, culpable, and market-threatening forms of insider trading. The appeal should be reheard.[1]

## Statement of the Case

Newman and Chiasson were hedge fund portfolio managers. Each employed an analyst who belonged to a small circle of friends—mostly other analysts—who conspired to share material nonpublic information so that they and their bosses could make massive trading profits. The analyst circle developed sources inside public companies who could access periodic earnings numbers as the numbers crystallized between a quarter's close and the public earnings release. This so-called "roll-up" period, in which financial results are gathered from individual business units and consolidated as investors await reporting of the final results, is a time when public companies place special importance on the need for secrecy. The hard earnings numbers the analyst circle collected from insiders in blatant disregard of the subject companies' confidentiality policies were highly valuable; someone who knew and bet on them before they were publicly released could reap enormous illicit gains.

---

[1]    The Solicitor General has authorized this petition for rehearing and rehearing *en banc*.

4

That is what happened here. Newman and Chiasson made $4 million and $68 million in profits for their respective funds by trading on secret earnings numbers that they encouraged their analysts to collect from Dell, Inc. and NVIDIA Corporation over multiple successive quarters. (GX 59, 64, 71, 73).[2] Most of these profits came from huge short positions that each defendant's fund took in Dell stock in August 2008, shortly before a negative earnings announcement by Dell that resulted in the largest single-day decline in the company's stock price in eight years. (GX 1842). Newman's information on Dell and NVIDIA came from his analyst, Jesse Tortora, who got the information from other co-conspirators in the analyst circle. (Tr. 138, 143-44, 1871-73; GX 805). Chiasson's information on these companies came from his analyst, Spyridon Adondakis, who, like Tortora, got the information from others within the circle. (Tr. 1708, 1714-15, 1878-79; GX 214).

## A. Disclosure of Inside Information at Dell

To get Dell inside information, analyst Sandeep Goyal cultivated a relationship with Dell insider Chandradip "Rob" Ray. Ray gave Goyal secret, advance earnings numbers for multiple successive quarters. (Tr. 150-56, 1415-21, 2759-69). Goyal and Ray had known each other for years; they had attended

---

[2] "Tr." refers to the trial transcript; "GX" refers to a Government Exhibit; "Add." refers to the addendum to this petition; and "Docket Entry" refers to an entry in the District Court docket for this case.

business school together, had worked at Dell together, had met each other's spouses, and spoke frequently. (Tr. 1390, 1411-12, 1469-70, 1628-30). Ray "desperately" wanted to be an analyst—a more lucrative job than his job at Dell—and looked to Goyal for career advice and help in securing such a position. (Tr. 1391-99, 1401-03, 1413-14; GX 708). To maintain the stream of valuable inside information from Ray, Goyal spoke with Ray more often and longer than he otherwise would have, typically at night and on weekends. (Tr. 1515, 1628-31). Goyal passed on the confidential earning numbers he received from Ray to Newman's analyst, Tortora, and Chiasson's analyst, Adondakis, both of whom then passed the information on to the defendants. (Tr. 138-44, 159, 1708, 1711, 1715, 1730). Recognizing the substantial economic advantage conferred on them by the inside information they were being provided, Newman and Chiasson traded on it shortly after receiving it from their analysts, sometimes while still on the phone with them. (GX 33, 50, 2501, 2501-DA).

For example, the enormously profitable Dell short that Newman placed in August 2008 followed a tip passed successively from Ray to Goyal to Tortora to Newman that Dell's gross margin would be 17.5% rather than the expected 18.3%. (Tr. 246-49; GX 214). One minute after receiving Tortora's email communicating this tip, Newman wrote Tortora to verify that the information was from Goyal: "the dell from sandy?" (Tr. 1197-1200; GX 215). Tortora confirmed that it was, and, within the hour, Newman began amassing his fund's short position. (GX 215, 2501-DA). Like Newman, Chiasson also received and bet

6

big on this information, netting an astounding $54 million for his fund. (Tr. 3168; GX 64).

Newman knew Tortora was getting his Dell information from Goyal, and that Goyal had a source inside Dell. (Tr. 158-61; GX 197, 214, 215, 228, 242, 287, 296, 322). Newman further knew that Goyal's source inside Dell was feeding Goyal earnings figures *during* the critical roll-up period, and was even updating Goyal as Dell's numbers became firmer. (*See, e.g.*, Tr. 158-61; GX 296). The immense value of this information was clear to Newman, who not only pressed Tortora to obtain it, but paid Goyal for conveying it. Specifically, Newman had his fund pay Goyal $175,000 through installments to Goyal's wife under a pretextual consulting arrangement, including a $100,000 bonus at the end of 2008 because, as Newman told Tortora, Goyal "helped us most." (GX 790; s*ee also* Tr. 1424-34).

Chiasson also knew that his inside earnings information about Dell was being obtained by Goyal from a source inside Dell. (Tr. 1708, 1757, 1778-79). And he demonstrated awareness that the information had been disclosed improperly, instructing Adondakis to keep details about the information out of email and create a bogus investor report to justify the Dell trades without reference to "information about contacts" (*i.e.*, insiders). (Tr. 1783-85, 1789-90; GX 460).

## B.  Disclosure of Inside Information at NVIDIA

Similarly, the NVIDIA evidence established that another member of the analyst circle, Danny Kuo, became friendly with Hyung Lim, who in turn was

friends with NVIDIA insider Chris Choi. Lim, Choi, and their families had been friends for years, and socialized and attended church together. (Tr. 3032-33). Choi divulged secret NVIDIA earnings information to Lim, knowing from Lim that Lim personally traded NVIDIA stock. (Tr. 3044, 3083). Lim, in turn, passed that information to Kuo, who shared it with his fellow analysts and co-conspirators, including Tortora and Adondakis. (Tr. 3033-39). Tortora and Adondakis passed the information up to Newman and Chiasson, each of whom promptly traded on it.

Newman knew that the information Tortora was supplying him about NVIDIA, including precise gross margin figures before those figures were publicly announced, was coming from an "accounting manager" within the company—someone plainly not authorized to give it out. (Tr. 1871-73; GX 805). Chiasson, for his part, knew that the NVIDIA figures were coming from an NVIDIA "contact" (Tr. 1878-79)—a term that Adondakis testified he used with Chiasson to mean someone within the company (Tr. 1785)—who "went to church with" a friend of Kuo's (Tr. 1878). Chiasson instructed Adondakis to prepare a sham NVIDIA trading report for investors along the same lines as Adondakis had prepared for the Dell trades—a report that would omit reference to insider sources. (Tr. 1893-95, 1898-1901; GX 928).

## C.  Proceedings Below and the Opinion

The defendants were tried by a jury in the fall of 2013 before the Honorable Richard J. Sullivan, United States District Judge. Judge Sullivan's instruction

on tippee scienter stated that the defendants could not be found guilty unless (1) they knew that the insider-tippers (Ray and Choi) had disclosed material nonpublic information in breach of a duty of confidence and (2) the insider-tippers' breaches of duty had *in fact* been for "personal benefit"—defined to include intangibles such as "maintaining a business contact" or "making a gift of confidential information to a trading relative or friend." (Tr. 4032-33). The defendants asked the District Court also to require the jury to find that the defendants *knew* that the insider-tippers' breaches had been for personal benefit. The Government opposed this request, and the District Court denied it. At the conclusion of the trial, the jury found Newman and Chiasson guilty of one count of conspiring to commit insider trading and four substantive counts of insider trading.

On December 10, 2014, the Panel reversed Newman's and Chiasson's convictions and ordered the charges against them dismissed with prejudice. The Panel offered two related bases for reversal.

First, seizing on an argument raised briefly by Newman alone, the Panel held that the Government had offered insufficient proof that any insider—Ray or Choi—personally benefitted by tipping confidential information. Specifically, the Panel concluded that neither the evidence of Goyal's career advice and support to Ray nor the proof that Choi gifted inside information to his friend Lim sufficed to demonstrate the requisite personal benefit. (Add. 21-23).

In reaching this conclusion, the Panel acknowledged that this Court, following the Supreme Court,

9

had previously defined personal benefit "'broadly'" to include "'not only pecuniary gain, but also . . . the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend.'" (Add. 21 (quoting *United States* v. *Jiau*, 734 F.3d 147, 153 (2d Cir. 2013)); *see also Dirks* v. *SEC*, 463 U.S. at 664 ("The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend.")). But it then constricted that definition and stated that prior precedent did "not suggest that the Government may prove the receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature." (Add. 21). Inferring a benefit from such a relationship, the Panel added, "is impermissible in the absence of proof of *a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature.*" (Add. 22 (emphasis added)). Notably, this narrow definition of what may qualify as a benefit—for which the Panel cited no authority—was never advanced by Newman, who, to the contrary, conceded in his own requests to charge that giving "information to another with the intention to confer a benefit on that person, or as a gift, or to benefit [oneself] in some manner" would suffice. (Docket Entry 160 at 28).

Second, the Panel held that even if the Government had offered sufficient proof of the requisite "meaningfully close personal relationship" generating an "exchange" along the lines it had specified, the Government also needed to prove that Newman and

10

Chiasson knew that such a personal benefit had been conferred on an insider. (Add. 18). The District Court's jury instructions, which omitted this knowledge requirement, were therefore erroneous. (Add. 18-19). Moreover, because the evidence of Newman's and Chiasson's knowledge that Ray or Choi received a cognizable personal benefit was, in the Panel's view, legally insufficient, the error was not only not harmless, but required the drastic remedy of dismissal of the charges with prejudice. (Add. 19-20, 24-28).[3]

## ARGUMENT

### POINT I

### The Panel's Constricted Definition of "Personal Benefit" Conflicts with Prior Decisions of the Supreme Court, Other Circuits, and this Court

The Panel's holding on the definition of "personal benefit" in insider trading cases—specifically, that illegal insider trading has occurred only when an in-

───────────

[3]   The Opinion also suggested that a superseding indictment was improperly filed to have co-conspirator Michael Steinberg's case assigned to Judge Sullivan. (Add. 17 n.5). But that issue was fully litigated by Steinberg. Judge Sullivan concluded, after reviewing the legitimate reasons for superseding, and consulting with Chief Judge Loretta A. Preska and other judges, that the approach was neither "improper" nor "unusual." (Tr., May 13, 2013, *United States* v. *Steinberg¸* 12 Cr. 121 (RJS), at 3).

11

sider-tipper's deliberate disclosure of material non-public information was for pecuniary gain or was part of a "meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature" (Add. 22)—cannot be squared with governing Supreme Court precedent, conflicts with prior holdings of other circuits and this Court, and defies practical application.

The Supreme Court held in *Dirks* that an insider breaches a duty owed to his company in a way that violates the federal securities laws when he discloses inside corporate information for an improper purpose —that is, for a personal benefit rather than a corporate purpose. *Dirks*, 463 U.S. at 662 ("Absent some personal gain, there has been no breach of duty to stockholders."). As the *Dirks* Court explained, the requisite personal benefit may be "direct or indirect," and it may take a wide variety of forms. *Id.* at 663-64. "[A] pecuniary gain or a reputational benefit that will translate into future earnings" may be present in some cases, but the benefit need not be monetary or even tangible. *Id.* at 664. "For example, there may be a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, *or an intention to benefit the particular recipient.*" *Id.* (emphasis added). Or, significantly, there may be "a gift of confidential information to a trading relative or friend," as "[t]he tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Id.*

In light of this language in *Dirks*, this Court has repeatedly recognized that the definition of benefit is "broad" and the "evidentiary bar is not a high one." *United States* v. *Jiau*, 734 F.3d at 153 (quotation marks, brackets, and citation omitted); *see also, e.g.*, *SEC* v. *Warde*, 151 F.3d 42, 48 (2d Cir. 1998). Other circuits have likewise embraced a broad conception of benefit, with the Seventh Circuit observing in one case that "[a]bsent some legitimate reason for [an insider's] disclosure . . . the inference that [the] disclosure was an improper gift of confidential corporate information is unassailable. After all, [the insider] did not have to make any disclosure, so why tell [the tippee] anything?" *SEC* v. *Maio*, 51 F.3d 623, 632 (7th Cir. 1995); *see also, e.g.*, *United States* v. *Evans*, 486 F.3d 315, 321 (7th Cir. 2007) ("the concept of gain is a broad one, which can include a 'gift of confidential information to a trading relative or friend'") (quoting *Dirks*, 463 U.S. at 664); *SEC* v. *Rocklage*, 470 F.3d 1, 7 n.4 (1st Cir. 2006) ("[T]he mere giving of a gift to a relative or friend is a sufficient personal benefit.").

The Panel took a very different approach. Although it quoted *Dirks*'s "gift" language, it added an unprecedented limitation that effectively upended *Dirks*: "To the extent *Dirks* suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee," the Panel held, "such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." (Add. 22).

13

This is flatly inconsistent with *Dirks*, as well as cases in this Circuit and others. The Opinion says that *Dirks* "does not suggest that the Government may prove the receipt of a personal benefit by the mere fact of a friendship." (Add. 21). But that is in fact precisely what *Dirks* says, *see Dirks*, 463 U.S. at 664 (benefit can be "a gift of confidential information to a trading relative or friend"), and this Court and others have recognized as much. In *Warde*, for example, this Court found adequate evidence of benefit to the tipper solely by virtue of a "close friendship" with the tippee. 151 F.3d at 48-49.[4] The Court did not require an "exchange" or "gain of a pecuniary or similarly valuable nature" to the tipper, or even a potential for pecuniary gain by the tipper; to the contrary, it held that the Government "need not show that the tipper expected or received a specific or tangible benefit in exchange for the tip." *Id.* at 48; *see also United States* v. *Whitman*, 904 F. Supp. 2d 363, 371 n.7 (S.D.N.Y. 2012) ("[T]he benefit does not need to be financial or tangible in nature" and can "include, for example, maintaining a useful networking contact . . . or just maintaining or furthering a friendship.");

_____

[4]   This "close friendship" was described in greater detail by the district court in *Warde* and is analogous to the relationships at issue here. The tipper and tippee there "would socialize several times a year," they "played cards, and discussed subjects ranging from art to the stock market." *SEC* v. *Downe*, 969 F. Supp. 149, 152 (S.D.N.Y. 1997) (citations omitted).

14

*United States* v. *Evans*, 486 F.3d at 321 (personal benefit "can include a 'gift of confidential information to a trading relative or friend' ").

The Panel not only effectively nullified part of the *Dirks* benefit test—apparently eliminating *Dirks*'s express recognition that an improper but uncompensated gift of information by an insider suffices—but, citing no authority, replaced it with a set of novel, confounding criteria for the type of "exchange" that will now be required before an insider's deliberate transmission of valuable inside information to a friend or relative could be punishable under the laws against insider trading. None of this new test's components—a "[1] meaningfully close personal relationship" generating "[2] an exchange that is [3] objective, [4] consequential, and [5] represents at least a potential gain of a pecuniary or similarly valuable nature" —has familiar meaning in this or any analogous area of law. There is no definition of what it means for a relationship to be "meaningfully close," nor explanation of what additional facts need be proved to establish that an "exchange" already "represent[ing]" at least a potential gain of a pecuniary or similarly valuable nature" is *also* "objective" *and* "consequential." Thus, to the extent the Panel sought to set clear guidelines for Wall Street professionals and prosecutors, the test it adopted will do just the opposite.

Finally, the policy concern apparently animating the Panel's adoption of this unduly restrictive and confusing benefit test is unfounded. The Panel's stated purpose was to prevent the benefit requirement from being so relaxed that it subsumes all disclosures

15

of confidential information. (*See* Add. 21-22). But while corporate insiders may in certain circumstances act (or believe they are acting) in shareholders' interests by assisting analysts to understand a corporation's affairs, they cross a line when they selectively disclose in order to favor a friend, to gain "reputational benefit," *Dirks*, 463 U.S. at 663, or to enhance their own careers. *Dirks* recognized that the line between legitimate corporate purpose and personal benefit "will not always be easy" to discern, but it supplied "a guiding principle" to inform the resolution of what is ultimately "a question of fact," *id.* at 664, without (as the Opinion does) announcing unnecessarily and artificially restrictive requirements such as the need for a meaningfully close personal relationship resulting in a pecuniary-type exchange.

## POINT II

### Under the Previously Existing and Correct Personal Benefit Standard, the Evidence Was Sufficient To Support the Convictions

The Panel's unduly narrow definition of personal benefit, combined with its failure to consider the Government's proof in the light most favorable to the Government (or to consider some aspects of the Government's proof at all), led it to reach the erroneous conclusion that the Government's evidence was insufficient. Applying the previously existing and correct definition of personal benefit, and viewing the totality of the Government's evidence under the correct standard for a sufficiency challenge, *see, e.g., United States* v. *Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)

16

(describing applicable standard), the Government should have been permitted to retry its case.

## A. The Evidence Was Sufficient to Establish that the Insiders Personally Benefitted from Their Improper Disclosures of Inside Information

First, under a proper "personal benefit" instruction (such as the one suggested by the parties and given by the District Court), the evidence amply supported the jury's conclusion that the Dell and NVIDIA insiders disclosed secret corporate information for personal benefit.

Regarding the Dell insider, Ray, the evidence established that he "desperately" wanted to become a Wall Street analyst like his friend Goyal (a former Dell colleague and the initial tippee)—a job that would be much more lucrative than Ray's position at Dell in Texas. (Tr. 1413-14; GX 708). Ray asked for and received advice and career assistance from Goyal. (Tr. 1391-99, 1401-03, 1413-14).

Because Goyal, in turn, wanted inside information from Ray, he spoke frequently with Ray about Ray's career, often for long stretches, usually at night and on weekends. (Tr. 1515, 1469-70). As Goyal testified, the nature and depth of the advice he gave Ray was different from what he gave other colleagues who were not furnishing him with inside information; Goyal was "very, very detailed for [Ray] and [he] spent a lot of time" with him—something he had not "done . . . with anybody else." (Tr. 1515). Goyal "ha[d]n't talked to somebody for half an hour or one hour or longer in procession for so many times.

17

[Ray]'s the only one . . . ." (Tr. 1630). Ray asked Goyal to forward his resume to others, and Goyal did so, sending it to a brokerage house recruiter and "put[ting] in a good word" for Ray elsewhere. (Tr. 1392-1403, 1423, 1435-36, 1447-50; GX 700, 705). He gave Ray an investment pitch to use in connection with job interviews. (Tr. 1460-61; GX 734). In at least one instance, Ray received career advice and disclosed confidential information on the same phone call. (Tr. 1457-61; GX 38, 733, 734). This evidence was more than sufficient to permit the inference that Ray was tipping information for the personal benefit of burnishing his relationship with Goyal in hopes of advancing his career—an inference buttressed by evidence that Ray disclosed information to Goyal during the roll-ups of multiple successive quarters, despite being clearly prohibited by Dell policy from doing so. (*See, e.g.*, Tr. 1410, 1415-16, 2766-69; GX 1650).

In reaching its contrary conclusion, the Panel not only applied an erroneous personal benefit test, but credited factual assertions that were unsupported by the record. For example, the Panel stated that Goyal "routinely" gave similar advice to other colleagues and that "Ray himself disavowed that any . . . *quid pro quo* existed." (Add. 23). But in fact, as noted, Goyal testified that he spoke with Ray at greater length and in greater depth than he would have to someone who could not offer him inside information. And there was no evidence that Ray—who did not testify at trial—"disavowed" a *quid pro quo*. Rather, Goyal—who did testify at trial—was asked on cross-examination whether Ray "ever connect[ed] the career advice with the information he was giving"—"[i]n

18

other words, did he ever say something like I'll give you this information, but only if you give me career advice?" (Tr. 1514). Goyal's response of "no" shows no more than that Ray (unsurprisingly) never made explicit to Goyal that he wanted career advice in return for inside information.

The proof that Choi disclosed confidential NVIDIA information for personal benefit was also sufficient under a proper benefit standard, because it showed that Choi gifted the information to a longtime friend who he knew traded in NVIDIA stock. Again, the Panel's contrary conclusion rests at least in part on factual findings that are unsupported and even contradicted by the record. The Opinion asserts that "Choi and Lim were merely casual acquaintances," and that Lim "testified that Choi did not know that Lim was trading NVIDIA stock." (Add. 23). This is incorrect. In fact, Lim testified that (1) he and Choi were friends who had known each other for over a decade, attended the same church together, spoke on the phone, met for lunch, had met each other's families, and, indeed, Lim on one occasion bought a gift for Choi's child (Tr. 3010, 3032-33, 3068); and (2) Lim not only specifically told Choi that he traded NVIDIA, but often asked for Choi's advice about whether, for example, Lim would "be able to sell [NVIDIA] stock for a profit" at a given point. (Tr. 3362-63; *see also* Tr. 3044, 3083). Choi supplied Lim with secret financial information about NVIDIA (including yet-to-be-announced revenue figures, gross margins to the "tenth of a decimal point," and forecasts for upcoming quarters), quarter after quarter. (Tr. 3046-47). Notably, Lim himself got a direct pecuniary benefit—

19

payment of $15,000—for the "help" he gave Danny Kuo during the period when he was relaying to Kuo inside information about NVIDIA and about his own employer. (Tr. 3010, 3039-42).

## B. The Evidence Was Sufficient to Establish that the Defendants Knew, Or Consciously Avoided Knowing, that the Insiders Personally Benefitted

Second, the evidence was sufficient to show that the defendants knew or consciously avoided knowing that the insider-tippers acted for personal benefit. As a result, upon concluding that the jury instructions had erroneously omitted that requirement, the Panel should have vacated the convictions and remanded for retrial, rather than reversing the convictions and ordering outright dismissal of the charges. *See, e.g., United States* v. *Hassan*, 578 F.3d 108, 134 (2d Cir. 2008) (permitting retrial before properly instructed jury); *United States* v. *Ekinci*, 101 F.3d 838, 844-45 (2d Cir. 1996) (same); *see also United States* v. *Ford*, 703 F.3d 708, 711 (4th Cir. 2013) (confirming that retrial is appropriate remedy in these circumstances); *United States* v. *Robison*, 505 F.3d 1208, 1225 (11th Cir. 2007) (same).

Focusing on the Dell trades, Newman knew Tortora's information was coming from Goyal, who, in turn, had an inside source with whom he spoke only "outside of work" hours. (Tr. 158-61; GX 197, 214, 215, 228, 242, 287, 296, 322). Newman further knew that this insider was giving Goyal highly accurate earnings figures, quarter after quarter, at multiple

20

points during each roll-up period—when internal numbers were being consolidated, and when no financial information should have been leaking from the company at all. (*See, e.g.*, Tr. 158-61; GX 296). Newman, moreover, was paying for this information through back channels—funneling $175,000 to Goyal through payments to Goyal's wife. (*See* Tr. 1424-34; GX 750-54, 790, 2270). Certainly, a jury could have inferred that if Goyal was receiving such a substantial benefit for providing information, which Newman knew and authorized, that Newman knew or consciously avoided knowing that Goyal's source at Dell was similarly receiving some kind of benefit. And Newman knew the tips he had on Dell were ones not known to the general market; that is why he began placing an enormous short within an hour of the August 2008 Dell tip. (GX 8529A).

Chiasson, too, either knew or consciously avoided knowing that he was getting material nonpublic information that had been disclosed improperly by an insider who was serving himself rather than his company. Adondakis told Chiasson that the information was coming from "someone within Dell" with whom Goyal was in contact. (Tr. 1708). When an acquaintance who worked at another hedge fund asked Chiasson how he obtained "checks on gm%"—meaning checks on gross margin percentages at Dell— Chiasson replied, "Not your concern. I just do." (GX 448 at 5). To avoid a paper trail evidencing his own guilty knowledge, Chiasson instructed Adondakis to keep details about the Dell information out of email, and had him create bogus trading reports that omitted reference to insider sources. (Tr. 1783-85).

21

Against this evidentiary backdrop, the Panel's conclusion that "the Government presented absolutely no testimony or any other evidence that Newman and Chiasson knew that they were trading on information obtained from insiders, or that those insiders received any benefit in exchange for such disclosures, or even that Newman and Chiasson consciously avoided learning of these facts" (Add. 24) is simply untenable. *See, e.g.*, *United States* v. *Goffer*, 721 F.3d 113, 124-27 (2d Cir. 2013) (concluding that evidence relating to knowledge and conscious avoidance in tipping chain case was sufficient to establish tippee scienter). So, too, is the Panel's accompanying conclusion that the evidence affirmatively "*undermined* the inference of knowledge" because the defendants could have thought that the tips they received were from authorized "leaks" or were legitimate analyst predictions. (Add. 25-27) (emphasis added). The record established that the top-line earnings numbers at issue here were different in kind from any arguably authorized leaks from the subject companies. (*See, e.g.*, Tr. 158, 1211-12, 1416). In any event, selective disclosure of earnings would be unlawful under SEC Regulation FD, 17 C.F.R. § 243.100 *et seq.*, and a jury could infer that Newman and Chiasson, as sophisticated securities professionals, knew that. Thus, even if the first tip of earnings numbers during a roll-up period conceivably could have been mistaken for a company-authorized "leak," the subsequent recurring flow of like figures, quarter after quarter, unaccompanied by contemporaneous public disclosures renders any claim of misunderstanding on this front implausible.

Nor could either defendant have mistaken these numbers for legitimate analyst predictions. Analysts' models do not speak of "rolled-up" numbers, which get "more firm" as the public reporting date approaches. (*See* GX 214, 296). And the August 2008 tip was that Dell's gross margin would be far below market expectations—17.5% compared to the consensus of 18.3%. Not a single analyst report published in advance of Dell's earnings release predicted even a number below 18%. (GX 3003S).

Given the substantial evidence and argument that the Government would have at its disposal on retrial before a properly instructed jury to establish the defendants' knowledge or conscious avoidance of knowledge that the insider-tippers acted for personal benefit (properly defined), the Panel should not have usurped the jury's role in making factual determinations. Rather, the convictions should have been vacated and the case remanded for retrial.

## POINT III

## The Panel's Definition of Personal Benefit Threatens the Integrity of the Securities Markets

This case, as the immediate and widespread attention to the Opinion evinces, is of surpassing importance to the integrity of the securities markets. As it currently stands, the Opinion's "exchange"-based, pecuniary limitation on what constitutes a personal benefit, and its resulting absolution of deliberate, corrupt, and formerly criminal insider trading that fails this new test, arguably represents one of the most significant developments in insider trading law in a

generation. And the Opinion is wrong. Indeed, the significance of the Opinion stems in large part from the degree to which the Panel deviated from *Dirks* and virtually every case since concerning the meaning of the personal benefit requirement.

The Panel's redefinition of what can constitute a personal benefit to an insider—particularly in combination with the newly announced requirement that a tippee know of that benefit—significantly weakens protections against the abuse of inside information by market professionals with special access, and threatens to undermine enforcement efforts that are vital to fairness (and the perception thereof) in the securities markets. The Panel's ambiguous and diluted notion of when an insider "personally benefits" from disclosure of inside information not only conflicts with Supreme Court precedent, but also invites selective leaking of valuable information to favored friends and associates of well-placed corporate insiders.[5] And its

_____

[5] For example, contrary to all previous understanding of the securities laws, under the Panel's definition of personal benefit, a company executive's deliberate gift to a friend of information about an upcoming merger—among the most closely guarded and market-moving corporate secrets—could allow the tippee to earn millions, with both parties avoiding insider trading liability because the tipper did not expect any pecuniary or "similar" value in return. Indeed, further illustrating the Opinion's impact on the settled understanding of what constitutes insider trading, a Southern District of New York judge yes-

24

mistaken application of that novel and erroneous standard to the evidence in this case provides a virtual roadmap for savvy hedge-fund managers and other traders to insulate themselves from tippee liability by knowingly placing themselves at the end of a chain of inside information and avoiding learning the details about the sources of obviously confidential and improperly disclosed information. *Cf. United States* v. *Libera*, 989 F.2d 596, 600 (2d Cir. 1993) (rejecting proposed scienter requirement that "would serve no purpose other than to create a loophole for" misuse of information to commit insider trading).

The consequences for investor confidence are plain: individuals will perceive that cozy relationships between insiders and the most sophisticated traders allow exploitation of nonpublic information for personal gain. As the Supreme Court has recognized, this outcome contravenes the basic objective of the securities laws: "to insure honest securities markets and thereby promote investor confidence." *United States* v. *O'Hagan*, 521 U.S. 642, 652 (1997). Moreover, this Court's preeminence in the field of securities regulation, and its jurisdiction over the financial

––––––––––

terday relied on the Opinion to vacate the guilty pleas of four defendants whose guilt had previously been disputed by nobody—not by the grand jury that indicted them, the sophisticated defense attorneys who counseled them, or the defendants themselves, who had each pled guilty and admitted to having willfully committed insider trading. (*See United States* v. *Conradt*, No. 12 Cr. 887 (ALC), Docket Entry No. 166).

25

capital of the world, serve to underline the Opinion's importance nationally and, consequently, magnify the harm that will result from its errors. As this Court has implicitly recognized in its previous decisions to sit *en banc* in insider trading cases, in this field, this particular Court has a special responsibility to the development of the law that outweighs its ordinary reluctance to reconsider the decisions of its panels.

In this instance, on an issue of this consequence, in an area of this Court's particular and recognized expertise, rehearing should be granted and the Opinion's errors should be corrected.

## CONCLUSION

**The petition for panel rehearing and rehearing *en banc* should be granted.**

Dated:    New York, New York
          January 23, 2015

                        Respectfully submitted,

                        PREET BHARARA,
                        *United States Attorney for the*
                        *Southern District of New York,*
                        *Attorney for the United States*
                            *of America.*

SARAH E. MCCALLUM,
ROBERT W. ALLEN,
HARRY A. CHERNOFF,
MICHAEL A. LEVY,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this brief exceeds the page limits set by Rules 35(b)(2) and 40(b) of the Federal Rules of Appellate Procedure, but is within the 25-page limit for which the Government is seeking permission in a motion being filed simultaneously with this petition.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: MICHAEL A. LEVY,
*Assistant United States Attorney*

**ADDENDUM**

Add. 1

13-1837-cr (L)
*United States v. Newman and Chiasson*

# In the
# United States Court of Appeals
# For the Second Circuit

————

August Term, 2013

Nos. 13-1837-cr (L), 13-1917-cr (con)

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

TODD NEWMAN, ANTHONY CHIASSON,
*Defendants-Appellants,*

JON HORVATH, DANNY KUO, HYUNG G. LIM, MICHAEL STEINBERG,
*Defendants.*[1]

————

Appeal from the United States District Court
for the Southern District of New York.
No. 12 CR 121(RJS) — Richard J. Sullivan, *Judge.*

————

Argued: April 22, 2014
Decided: December 10, 2014

————

---

[1] The Clerk of Court is directed to amend the caption as set forth above.

Add. 2

2                                     Nos. 13-1837-cr; 13-1917-cr


Before: WINTER, PARKER, and HALL, *Circuit Judges*.

————

Defendants-appellants Todd Newman and Anthony Chiasson appeal from judgments of conviction entered on May 9, 2013, and May 14, 2013, respectively, in the United States District Court for the Southern District of New York (Richard J. Sullivan, *J.*) following a six-week jury trial on charges of conspiracy to commit insider trading and insider trading in violation of 18 U.S.C. § 371, sections 10(b) and 32 of the Securities Exchange Act of 1934, SEC Rules 10b-5 and 10b5-2, and 18 U.S.C. § 2. Because the Government failed to present sufficient evidence that the defendants willfully engaged in substantive insider trading or a conspiracy to commit insider trading in violation of the federal securities laws, we reverse Newman and Chiasson's convictions and remand with instructions to dismiss the indictment as it pertains to them with prejudice.

————

STEPHEN FISHBEIN (John A. Nathanson, Jason M. Swergold, *on the brief*), Shearman & Sterling LLP, New York, NY, *for Defendant-Appellant Todd Newman.*

MARK F. POMERANTZ (Matthew J. Carhart; Alexandra A.E. Shapiro, Daniel J. O'Neill, Jeremy Licht, Shapiro, Arato & Isserles LLP, New York, NY; Gregory R. Morvillo, Morvillo LLP, New York, NY *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Defendant-Appellant Anthony Chiasson.*

ANTONIA M. APPS (Richard C. Tarlowe, Micah W.J. Smith, Brent S. Wible, *on the brief*), Assistant

Add. 3

3                                   Nos. 13-1837-cr; 13-1917-cr

United States Attorneys *for* Preet Bharara, United States Attorney, Southern District of New York, New York, NY, *for Appellee.*

Ira M. Feinberg, Jordan L. Estes, Hagan Scotten, Hogan Lovells US LLP, New York, NY; Joshua L. Dratel, Law Offices of Joshua L. Dratel, P.C., New York, NY, *for Amicus Curiae National Association of Criminal Defense Lawyers.*

———

Barrington D. Parker, *Circuit Judge*:

Defendants-appellants Todd Newman and Anthony Chiasson appeal from judgments of conviction entered on May 9, 2013, and May 14, 2013, respectively in the United States District Court for the Southern District of New York (Richard J. Sullivan, *J.*) following a six-week jury trial on charges of securities fraud in violation of sections 10(b) and 32 of the Securities Exchange Act of 1934 (the "1934 Act"), 48 Stat. 891, 904 (codified as amended at 15 U.S.C. §§ 78j(b), 78ff), Securities and Exchange Commission (SEC) Rules 10b-5 and 10b5-2 (codified at 17 C.F.R. §§ 240.10b-5, 240.10b5-2), and 18 U.S.C. § 2, and conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.

The Government alleged that a cohort of analysts at various hedge funds and investment firms obtained material, nonpublic information from employees of publicly traded technology companies, shared it amongst each other, and subsequently passed this information to the portfolio managers at their respective companies. The Government charged Newman, a portfolio manager at Diamondback Capital Management, LLC ("Diamondback"), and Chiasson, a portfolio manager at Level

Add. 4

Global Investors, L.P. ("Level Global"), with willfully participating in this insider trading scheme by trading in securities based on the inside information illicitly obtained by this group of analysts. On appeal, Newman and Chiasson challenge the sufficiency of the evidence as to several elements of the offense, and further argue that the district court erred in failing to instruct the jury that it must find that a tippee knew that the insider disclosed confidential information in exchange for a personal benefit.

We agree that the jury instruction was erroneous because we conclude that, in order to sustain a conviction for insider trading, the Government must prove beyond a reasonable doubt that the tippee knew that an insider disclosed confidential information *and* that he did so in exchange for a personal benefit. Moreover, we hold that the evidence was insufficient to sustain a guilty verdict against Newman and Chiasson for two reasons. *First*, the Government's evidence of any personal benefit received by the alleged insiders was insufficient to establish the tipper liability from which defendants' purported tippee liability would derive. *Second*, even assuming that the scant evidence offered on the issue of personal benefit was sufficient, which we conclude it was not, the Government presented no evidence that Newman and Chiasson knew that they were trading on information obtained from insiders in violation of those insiders' fiduciary duties.

Accordingly, we reverse the convictions of Newman and Chiasson on all counts and remand with instructions to dismiss the indictment as it pertains to them with prejudice.

**BACKGROUND**

This case arises from the Government's ongoing investigation into suspected insider trading activity at hedge funds. On January 18, 2012, the Government unsealed charges against Newman,

Add. 5

Chiasson, and several other investment professionals.  On February
7, 2012, a grand jury returned an indictment.  On August 28, 2012, a
twelve-count Superseding Indictment S2 12 Cr. 121 (RJS) (the
"Indictment") was filed.   Count One of the Indictment charged
Newman, Chiasson, and a co-defendant with conspiracy to commit
securities fraud, in violation of 18 U.S.C. § 371. Each of Counts Two
through Five charged Newman and each of Counts Six through Ten
charged Chiasson with securities fraud, in violation of sections 10(b)
and 32 of the 1934 Act, SEC Rules 10b-5 and 105b-2, and 18 U.S.C. §
2.   A co-defendant was charged with securities fraud in Counts
Eleven and Twelve.

        At trial, the Government presented evidence that a group of
financial analysts exchanged information they obtained from
company insiders, both directly and more often indirectly.
Specifically, the Government alleged that these analysts received
information from insiders at Dell and NVIDIA disclosing those
companies' earnings numbers before they were publicly released in
Dell's May 2008 and August 2008 earnings announcements and
NVIDIA's May 2008 earnings announcement.   These analysts then
passed the inside information to their portfolio managers, including
Newman and Chiasson, who, in turn, executed trades in Dell and
NVIDIA stock, earning approximately $4 million and $68 million,
respectively, in profits for their respective funds.

        Newman and Chiasson were several steps removed from the
corporate insiders and there was no evidence that either was aware
of the source of the inside information.   With respect to the Dell
tipping chain, the evidence established that Rob Ray of Dell's
investor relations department tipped information regarding Dell's
consolidated earnings numbers to Sandy Goyal, an analyst at
Neuberger Berman. Goyal in turn gave the information to
Diamondback analyst Jesse Tortora.   Tortora in turn relayed the

Case 13-1917, Document 221, 01/23/2015, 1423140, Page37 of 59

Add. 6

6                                    Nos. 13-1837-cr; 13-1917-cr

information to his manager Newman as well as to other analysts including Level Global analyst Spyridon "Sam" Adondakis. Adondakis then passed along the Dell information to Chiasson, making Newman and Chiasson three and four levels removed from the inside tipper, respectively.

With respect to the NVIDIA tipping chain, the evidence established that Chris Choi of NVIDIA's finance unit tipped inside information to Hyung Lim, a former executive at technology companies Broadcom Corp. and Altera Corp., whom Choi knew from church. Lim passed the information to co-defendant Danny Kuo, an analyst at Whittier Trust. Kuo circulated the information to the group of analyst friends, including Tortora and Adondakis, who in turn gave the information to Newman and Chiasson, making Newman and Chiasson four levels removed from the inside tippers.

Although Ray and Choi have yet to be charged administratively, civilly, or criminally for insider trading or any other wrongdoing, the Government charged that Newman and Chiasson were criminally liable for insider trading because, as sophisticated traders, they must have known that information was disclosed by insiders in breach of a fiduciary duty, and not for any legitimate corporate purpose.

At the close of evidence, Newman and Chiasson moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. They argued that there was no evidence that the corporate insiders provided inside information in exchange for a personal benefit which is required to establish tipper liability under *Dirks v. S.E.C.*, 463 U.S. 646 (1983). Because a tippee's liability derives from the liability of the tipper, Newman and Chiasson argued that they could not be found guilty of insider trading. Newman and Chiasson also argued that, even if the corporate

Add. 7

insiders had received a personal benefit in exchange for the inside information, there was no evidence that they knew about any such benefit. Absent such knowledge, appellants argued, they were not aware of, or participants in, the tippers' fraudulent breaches of fiduciary duties to Dell or NVIDIA, and could not be convicted of insider trading under *Dirks*. In the alternative, appellants requested that the court instruct the jury that it must find that Newman and Chiasson knew that the corporate insiders had disclosed confidential information for personal benefit in order to find them guilty.

The district court reserved decision on the Rule 29 motions. With respect to the appellants' requested jury charge, while the district court acknowledged that their position was "supportable certainly by the language of *Dirks*," Tr. 3595:10-12, it ultimately found that it was constrained by this Court's decision in *S.E.C. v. Obus*, 693 F.3d 276 (2d Cir. 2012), which listed the elements of tippee liability without enumerating knowledge of a personal benefit received by the insider as a separate element. Tr. 3604:3-3605:5. Accordingly, the district court did not give Newman and Chiasson's proposed jury instruction. Instead, the district court gave the following instructions on the tippers' intent and the personal benefit requirement:

> Now, if you find that Mr. Ray and/or Mr. Choi had a fiduciary or other relationship of trust and confidence with their employers, then you must next consider whether the [G]overnment has proven beyond a reasonable doubt that they intentionally breached that duty of trust and confidence by disclosing material[,] nonpublic information for their own benefit.

Tr. 4030.

Add. 8

On the issue of the appellants' knowledge, the district court instructed the jury:

> To meet its burden, the [G]overnment must also prove beyond a reasonable doubt that the defendant you are considering knew that the material, nonpublic information had been disclosed by the insider in breach of a duty of trust and confidence. The mere receipt of material, nonpublic information by a defendant, and even trading on that information, is not sufficient; he must have known that it was originally disclosed by the insider in violation of a duty of confidentiality.

Tr. 4033:14-22.

On December 17, 2012, the jury returned a verdict of guilty on all counts. The district court subsequently denied the appellants' Rule 29 motions.

On May 2, 2013, the district court sentenced Newman to an aggregate term of 54 months' imprisonment, to be followed by one year of supervised release, imposed a $500 mandatory special assessment, and ordered Newman to pay a $1 million fine and to forfeit $737,724. On May 13, 2013, the district court sentenced Chiasson to an aggregate term of 78 months' imprisonment, to be followed by one year of supervised release, imposed a $600 mandatory special assessment, and ordered him to pay a $5 million fine and forfeiture in an amount not to exceed $2 million.[2] This appeal followed.

---

[2] The district court subsequently set the forfeiture amount at $1,382,217.

Add. 9

### DISCUSSION

Newman and Chiasson raise a number of arguments on appeal. Because we conclude that the jury instructions were erroneous and that there was insufficient evidence to support the convictions, we address only the arguments relevant to these issues. We review jury instructions *de novo* with regard to whether the jury was misled or inadequately informed about the applicable law. *See United States v. Moran-Toala*, 726 F.3d 334, 344 (2d Cir. 2013).

### I.        The Law of Insider Trading

Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." Although Section 10(b) was designed as a catch-all clause to prevent fraudulent practices, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 202-06 (1976), neither the statute nor the regulations issued pursuant to it, including Rule 10b-5, expressly prohibit insider trading. Rather, the unlawfulness of insider trading is predicated on the notion that insider trading is a type of securities fraud proscribed by Section 10(b) and Rule 10b-5. *See Chiarella v. United States*, 445 U.S. 222, 226-30 (1980).

### A.        The "Classical" and "Misappropriation" Theories of Insider Trading

The classical theory holds that a corporate insider (such as an officer or director) violates Section 10(b) and Rule 10b-5 by trading in the corporation's securities on the basis of material, nonpublic information about the corporation. *Id*. at 230. Under this theory, there is a special "relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position within that

Add. 10

corporation." *Id*. at 228. As a result of this relationship, corporate insiders that possess material, nonpublic information have "a duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholders.'" *Id*. at 228-29 (citation omitted).

In accepting this theory of insider trading, the Supreme Court explicitly rejected the notion of "a general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Id*. at 233. Instead, the Court limited the scope of insider trading liability to situations where the insider had "a duty to disclose arising from a relationship of trust and confidence between parties to a transaction," such as that between corporate officers and shareholders. *Id*. at 230.

An alternative, but overlapping, theory of insider trading liability, commonly called the "misappropriation" theory, expands the scope of insider trading liability to certain other "outsiders," who do not have any fiduciary or other relationship to a corporation or its shareholders. Liability may attach where an "outsider" possesses material non-public information about a corporation and another person uses that information to trade in breach of a duty owed to the owner. *United States v. O'Hagan*, 521 U.S. 642, 652-53 (1997); *United States v. Libera*, 989 F.2d 596, 599-600 (2d Cir. 1993). In other words, such conduct violates Section 10(b) because the misappropriator engages in deception by pretending "loyalty to the principal while secretly converting the principal's information for personal gain." *Obus*, 693 F.3d at 285 (citations omitted).

B.    Tipping Liability

The insider trading case law, however, is not confined to insiders or misappropriators who trade for their own accounts. *Id*. at 285. Courts have expanded insider trading liability to reach situations where the insider or misappropriator in possession of

Add. 11

material nonpublic information (the "tipper") does not himself trade but discloses the information to an outsider (a "tippee") who then trades on the basis of the information before it is publicly disclosed. *See Dirks*, 463 U.S. at 659. The elements of tipping liability are the same, regardless of whether the tipper's duty arises under the "classical" or the "misappropriation" theory. *Obus*, 693 F.3d at 285-86.

In *Dirks*, the Supreme Court addressed the liability of a tippee analyst who received material, nonpublic information about possible fraud at an insurance company from one of the insurance company's former officers. *Dirks*, 463 U.S. at 648-49. The analyst relayed the information to some of his clients who were investors in the insurance company, and some of them, in turn, sold their shares based on the analyst's tip. *Id*. The SEC charged the analyst Dirks with aiding and abetting securities fraud by relaying confidential and material inside information to people who traded the stock.

In reviewing the appeal, the Court articulated the general principle of tipping liability: "Not only are insiders forbidden by their fiduciary relationship from personally using undisclosed corporate information to their advantage, but they may not give such information to an outsider for the same improper purpose of exploiting the information for their personal gain." *Id*. at 659 (citation omitted). The test for determining whether the corporate insider has breached his fiduciary duty "is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, *there has been no breach of duty . . . .*" *Id*. at 662 (emphasis added).

The Supreme Court rejected the SEC's theory that a recipient of confidential information (i.e. the "tippee") must refrain from trading "whenever he receives inside information from an insider." *Id*. at 655. Instead, the Court held that "[t]he tippee's duty to

Add. 12

disclose or abstain is derivative from that of the insider's duty." *Id.* at 659. Because the *tipper's* breach of fiduciary duty requires that he "personally will benefit, directly or indirectly, from his disclosure," *id.* at 662, a tippee may not be held liable in the absence of such benefit. Moreover, the Supreme Court held that a tippee may be found liable "only when the insider has breached his fiduciary duty . . . *and* the tippee knows or should know that there has been a breach." *Id.* at 660 (emphasis added). In *Dirks*, the corporate insider provided the confidential information in order to expose a fraud in the company and not for any personal benefit, and thus, the Court found that the insider had not breached his duty to the company's shareholders and that Dirks could not be held liable as tippee.

E.    *Mens Rea*

Liability for securities fraud also requires proof that the defendant acted with scienter, which is defined as "a mental state embracing intent to deceive, manipulate or defraud." *Hochfelder*, 425 U.S. at 193 n.12. In order to establish a criminal violation of the securities laws, the Government must show that the defendant acted "willfully." 15 U.S.C. § 78ff(a). We have defined willfulness in this context "as a realization on the defendant's part that he was doing a wrongful act under the securities laws." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotation marks and citations omitted); *see also United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir. 1976) (holding that to establish willfulness, the Government must "establish a realization on the defendant's part that he was doing a wrongful act . . . under the securities laws" and that such an act "involve[d] a significant risk of effecting the violation that occurred.") (quotation omitted).

II.    The Requirements of Tippee Liability

The Government concedes that tippee liability requires proof of a personal benefit to the insider. Gov't Br. 56. However, the

Add. 13

Government argues that it was not required to prove that Newman and Chiasson knew that the insiders at Dell and NVIDIA received a personal benefit in order to be found guilty of insider trading. Instead, the Government contends, consistent with the district court's instruction, that it merely needed to prove that the "defendants traded on material, nonpublic information they knew insiders had disclosed in breach of a duty of confidentiality . . . ." Gov't Br. 58.

In support of this position, the Government cites *Dirks* for the proposition that the Supreme Court only required that the "tippee know that the tipper disclosed information in *breach of a duty*." *Id.* at 40 (citing *Dirks*, 463 U.S. at 660) (emphasis added). In addition, the Government relies on dicta in a number of our decisions post-*Dirks*, in which we have described the elements of tippee liability without specifically stating that the Government must prove that the tippee knew that the corporate insider who disclosed confidential information did so for his own personal benefit. *Id.* at 41-44 (citing, *inter alia*, *United States v. Jiau*, 734 F.3d 147, 152-53 (2d Cir. 2013); *Obus*, 693 F.3d at 289; *S.E.C. v. Warde*, 151 F.3d 42, 48-49 (2d Cir. 1998)). By selectively parsing this dictum, the Government seeks to revive the absolute bar on tippee trading that the Supreme Court explicitly rejected in *Dirks*.

Although this Court has been accused of being "somewhat Delphic" in our discussion of what is required to demonstrate tippee liability, *United States v. Whitman*, 904 F. Supp. 2d 363, 371 n.6 (S.D.N.Y. 2012), the Supreme Court was quite clear in *Dirks*. *First*, the tippee's liability derives *only* from the tipper's breach of a fiduciary duty, *not* from trading on material, non-public information. *See Chiarella*, 445 U.S. at 233 (noting that there is no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information"). *Second*, the corporate insider has committed no breach of fiduciary duty

Add. 14

unless he receives a personal benefit in exchange for the disclosure. *Third*, even in the presence of a tipper's breach, a tippee is liable only if he knows or should have known of the breach.

While we have not yet been presented with the question of whether the tippee's knowledge of a tipper's breach requires knowledge of the tipper's personal benefit, the answer follows naturally from *Dirks*. *Dirks* counsels us that the exchange of confidential information for personal benefit is not separate from an insider's fiduciary breach; it *is* the fiduciary breach that triggers liability for securities fraud under Rule 10b-5. For purposes of insider trading liability, the insider's disclosure of confidential information, standing alone, is not a breach. Thus, without establishing that the tippee knows of the personal benefit received by the insider in exchange for the disclosure, the Government cannot meet its burden of showing that the tippee knew of a breach.

The Government's overreliance on our prior dicta merely highlights the doctrinal novelty of its recent insider trading prosecutions, which are increasingly targeted at remote tippees many levels removed from corporate insiders. By contrast, our prior cases generally involved tippees who directly participated in the tipper's breach (and therefore had knowledge of the tipper's disclosure for personal benefit) or tippees who were explicitly apprised of the tipper's gain by an intermediary tippee. *See, e.g., Jiau*, 734 F.3d at 150 ("To provide an incentive, Jiau promised the tippers insider information for their own private trading."); *United States v. Falcone*, 257 F.3d 226, 235 (2d Cir. 2001) (affirming conviction of remote tipper where intermediary tippee paid the inside tipper and had told remote tippee "the details of the scheme"); *Warde*, 151 F.3d at 49 (tipper and tippee engaged in parallel trading of the inside information and "discussed not only the inside information, but also the best way to profit from it"); *United States v. Mylett*, 97 F.3d 663 (2d Cir. 1996) (tippee acquired

Add. 15

inside information directly from his insider friend).  We note that the Government has not cited, nor have we found, a single case in which tippees as remote as Newman and Chiasson have been held criminally liable for insider trading.

*Jiau* illustrates the importance of this distinction quite clearly.  In *Jiau*, the panel was presented with the question of whether the evidence at trial was sufficient to prove that the tippers personally benefitted from their disclosure of insider information.   In that context, we summarized the elements of criminal liability as follows:

> (1) the insider-tippers . . . were entrusted the duty to protect confidential information, which (2) they breached by disclosing [the information] to their tippee . . . , who (3) knew of [the tippers'] duty and (4) still used the information to trade a security or further tip the information for [the tippee's] benefit, and finally (5) the insider-tippers benefited in some way from their disclosure.

*Jiau*, 734 F.3d at 152-53 (citing *Dirks*, 463 U.S. at 659-64; *Obus*, 693 F. 3d at 289).  The Government relies on this language to argue that *Jiau* is merely the most recent in a string of cases in which this Court has found that a tippee, in order to be criminally liable for insider trading, need know only that an insider-tipper disclosed information in breach of a duty of confidentiality.  Gov't Br. 43.  However, we reject the Government's position that our cursory recitation of the elements in *Jiau* suggests that criminal liability may be imposed on a defendant based only on knowledge of a breach of a duty of confidentiality.  In *Jiau*, the defendant knew about the benefit because she provided it.  For that reason, we had no need to reach the question of whether knowledge of a breach requires that a tippee know that a personal benefit was provided to the tipper.

In light of *Dirks*, we find no support for the Government's contention that knowledge of a breach of the duty of confidentiality

Add. 16

without knowledge of the personal benefit is sufficient to impose
criminal liability.  Although the Government might like the law to
be different, nothing in the law requires a symmetry of information
in the nation's securities markets.  The Supreme Court explicitly
repudiated this premise not only in *Dirks*, but in a predecessor case,
*Chiarella v. United States*.  In *Chiarella*, the Supreme Court rejected
this Circuit's conclusion that "the federal securities laws have
created a system providing equal access to information necessary for
reasoned and intelligent investment decisions . . . . because [material
non-public] information gives certain buyers or sellers an unfair
advantage over less informed buyers and sellers."  445 U.S. at 232.
The Supreme Court emphasized that "[t]his reasoning suffers from
[a] defect. . . . [because] not every instance of financial unfairness
constitutes fraudulent activity under § 10(b)."  *Id*.  *See also United
States v. Chestman*, 947 F.2d 551, 578 (2d Cir. 1991) (Winter, J.,
concurring) ("[The policy rationale [for prohibiting insider trading]
stops well short of prohibiting all trading on material nonpublic
information. Efficient capital markets depend on the protection of
property rights in information.  However, they also require that
persons who acquire and act on information about companies be
able to profit from the information they generate . . . .").  Thus, in
both *Chiarella* and *Dirks*, the Supreme Court affirmatively
established that insider trading liability is based on breaches of
fiduciary duty, not on informational asymmetries.  This is a critical
limitation on insider trading liability that protects a corporation's
interests in confidentiality while promoting efficiency in the nation's
securities markets.

As noted above, *Dirks* clearly defines a breach of fiduciary
duty as a breach of the duty of confidentiality in exchange for a
personal benefit.  *See Dirks*, 463 U.S. at 662.  Accordingly, we
conclude that a tippee's knowledge of the insider's breach
necessarily requires knowledge that the insider disclosed

Add. 17

confidential information in exchange for personal benefit.   In reaching this conclusion, we join every other district court to our knowledge – apart from Judge Sullivan[3] – that has confronted this question.   *Compare United States v. Rengan Rajaratnam*, No. 13-211 (S.D.N.Y. July 1, 2014) (Buchwald, J.); *United States v. Martoma*, No. 12-973 (S.D.N.Y. Feb. 4, 2014) (Gardephe, J.); *United States v. Whitman*, 904 F. Supp. 2d 363, 371 (S.D.N.Y. 2012) (Rakoff, J.); *United States v. Raj Rajaratnam*, 802 F. Supp. 2d 491, 499 (S.D.N.Y. 2011) (Holwell, J.); *State Teachers Retirement Bd. v. Fluor Corp.*, 592 F. Supp. 592, 594 (S.D.N.Y. 1984) (Sweet, J.),[4] *with United States v. Steinberg*, No. 12-121, 2014 WL 2011685 at *5 (S.D.N.Y. May 15, 2014) (Sullivan, J.), and *United States v. Newman*, No. 12-121 (S.D.N.Y. Dec. 6, 2012) (Sullivan, J.).[5]

---

[3] Although the Government argues that district court decisions in *S.E.C. v. Thrasher*, 152 F. Supp. 2d (S.D.N.Y. 2001) and *S.E.C. v. Musella*, 678 F. Supp. 1060 (S.D.N.Y. 1988) support their position, these cases merely stand for the unremarkable proposition that a tippee does not need to know the details of the insider's disclosure of information. The district courts determined that the tippee did not have to know for certain how information was disclosed, *Thrasher*, 152 F. Supp. 2d at 304-05, nor the identity of the insiders, *Musella*, 678 F. Supp. at 1062-63. This is not inconsistent with a requirement that a defendant tippee understands that some benefit is being provided in return for information.

[4] *See also United States v. Santoro*, 647 F. Supp. 153, 170-71 (E.D.N.Y. 1986) ("An allegation that the tippee knew of the tipper's breach necessarily charges that the tippee knew that the tipper was acting for personal gain.") *rev'd on other grounds sub nom. United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988); *Hernandez v. United States*, 450 F. Supp. 2d 1112, 1118 (C.D. Cal. 2006) ("[U]nder the standard set forth in *Dirks*" a tippee can be liable under Section 10(b) and Rule 10(b)-5 "if the tippee had knowledge of the insider-tipper's personal gain.").

[5] We note that Judge Sullivan had an opportunity to address the issue in *Steinberg* only because the Government chose to charge Matthew Steinberg in the same criminal case as Newman and Chiasson by filing a superseding indictment. Notably, the Government superseded to add Steinberg on March 29, 2013, after the conclusion of the *Newman* trial, after Judge Sullivan refused to give the defendants' requested charge on scienter now at issue on this appeal, and at a time when there was no possibility of a joint trial with the *Newman* defendants.

Add. 18

Our conclusion also comports with well-settled principles of substantive criminal law.  As the Supreme Court explained in *Staples v. United States*, 511 U.S. 600, 605 (1994), under the common law, *mens rea*, which requires that the defendant know the facts that make his conduct illegal, is a necessary element in every crime.  Such a requirement is particularly appropriate in insider trading cases where we have acknowledged "it is easy to imagine a . . . trader who receives a tip and is unaware that his conduct was illegal and therefore wrongful." *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010).  This is also a statutory requirement, because only "willful" violations are subject to criminal provision.  *See United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006) ("'Willful' repeatedly has been defined in the criminal context as intentional, purposeful, and voluntary, as distinguished from accidental or negligent").

In sum, we hold that to sustain an insider trading conviction against a tippee, the Government must prove each of the following elements beyond a reasonable doubt: that (1) the corporate insider was entrusted with a fiduciary duty; (2) the corporate insider breached his fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit.  *See Jiau*, 734 F.3d at 152-53; *Dirks*, 463 U.S. at 659-64.

In view of this conclusion, we find, reviewing the charge as a whole, *United States v. Mitchell*, 328 F.3d 77, 82 (2d Cir. 2003), that the district court's instruction failed to accurately advise the jury of the law.  The district court charged the jury that the Government had to prove: (1) that the insiders had a "fiduciary or other relationship of trust and confidence" with their corporations; (2) that they "breached that duty of trust and confidence by disclosing material,

Add. 19

nonpublic information"; (3) that they "personally benefited in some way" from the disclosure; (4) "that the defendant . . . knew the information he obtained had been disclosed in breach of a duty"; and (5) that the defendant used the information to purchase a security.  Under these instructions, a reasonable juror might have concluded that a defendant could be criminally liable for insider trading merely if such defendant knew that an insider had divulged information that was required to be kept confidential.  But a breach of the duty of confidentiality is not fraudulent unless the tipper acts for personal benefit, that is to say, there is no breach unless the tipper "is in effect selling the information to its recipient for cash, reciprocal information, or other things of value for himself. . . ." *Dirks*, 463 U.S. at 664 (quotation omitted).  Thus, the district court was required to instruct the jury that the Government had to prove beyond a reasonable doubt that Newman and Chiasson knew that the tippers received a personal benefit for their disclosure.

The Government argues that any possible instructional error was harmless because the jury could have found that Newman and Chiasson inferred from the circumstances that some benefit was provided to (or anticipated by) the insiders. Gov't Br. 60.   We disagree.

An instructional error is harmless only if the Government demonstrates that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error[.]" *Neder v. United States,* 527 U.S. 1, 17-18 (1999); *accord Moran-Toala,* 726 F.3d at 345; *United States v. Quattrone,* 441 F.3d 153, 180 (2d Cir. 2006).  The harmless error inquiry requires us to view whether the evidence introduced was "uncontested and supported by overwhelming evidence" such that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder,* 527 U.S. at 18.  Here both Chiasson and Newman contested their knowledge of any benefit received by the

Add. 20

tippers and, in fact, elicited evidence sufficient to support a contrary finding. Moreover, we conclude that the Government's evidence of any personal benefit received by the insiders was insufficient to establish tipper liability from which Chiasson and Newman's purported tippee liability would derive.

III.    Insufficiency of the Evidence

As a general matter, a defendant challenging the sufficiency of the evidence bears a heavy burden, as the standard of review is exceedingly deferential. *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). Specifically, we "must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id*. (citing *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)). Although sufficiency review is *de novo*, we will uphold the judgments of conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (citing *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008) (emphasis omitted); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review draws no distinction between direct and circumstantial evidence. The Government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the Government still demonstrates each element of the charged offense beyond a reasonable doubt. *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008).

However, if the evidence "is nonexistent or so meager," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999), such that it "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," *Cassese*, 428 F.3d at 99. Because few events in the life of an individual are more important than a criminal

Add. 21

conviction, we continue to consider the "beyond a reasonable doubt" requirement with utmost seriousness. *Cassese*, 428 F.3d at 102. Here, we find that the Government's evidence failed to reach that threshold, even when viewed in the light most favorable to it.

The circumstantial evidence in this case was simply too thin to warrant the inference that the corporate insiders received any personal benefit in exchange for their tips. As to the Dell tips, the Government established that Goyal and Ray were not "close" friends, but had known each other for years, having both attended business school and worked at Dell together. Further, Ray, who wanted to become a Wall Street analyst like Goyal, sought career advice and assistance from Goyal. The evidence further showed that Goyal advised Ray on a range of topics, from discussing the qualifying examination in order to become a financial analyst to editing Ray's résumé and sending it to a Wall Street recruiter, and that some of this assistance began before Ray began to provide tips about Dell's earnings. The evidence also established that Lim and Choi were "family friends" that had met through church and occasionally socialized together. The Government argues that these facts were sufficient to prove that the tippers derived some benefit from the tip. We disagree. If this was a "benefit," practically anything would qualify.

We have observed that "[p]ersonal benefit is broadly defined to include not only pecuniary gain, but also, *inter alia*, any reputational benefit that will translate into future earnings and the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend." *Jiau*, 734 F. 3d at 153 (internal citations, alterations, and quotation marks deleted). This standard, although permissive, does not suggest that the Government may prove the receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature. If that were true, and the Government was allowed to meet its burden by

Add. 22

proving that two individuals were alumni of the same school or attended the same church, the personal benefit requirement would be a nullity. To the extent *Dirks* suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's trades "resemble trading by the insider himself followed by a gift of the profits to the recipient," *see* 643 U.S. at 664, we hold that such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature. In other words, as Judge Walker noted in *Jiau*, this requires evidence of "a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the [latter]." *Jiau*, 734 F. 3d at 153.

While our case law at times emphasizes language from *Dirks* indicating that the tipper's gain need not be *immediately* pecuniary, it does not erode the fundamental insight that, in order to form the basis for a fraudulent breach, the personal benefit received in exchange for confidential information must be of some consequence. For example, in *Jiau*, we noted that at least one of the corporate insiders received something more than the ephemeral benefit of the "value[] [of] [Jiau's] friendship" because he also obtained access to an investment club where stock tips and insight were routinely discussed. *Id*. Thus, by joining the investment club, the tipper entered into a relationship of *quid quo pro* with Jiau, and therefore had the opportunity to access information that could yield future pecuniary gain. *Id*; *see also SEC v. Yun*, 327 F.3d 1263, 1280 (11th Cir. 2003) (finding evidence of personal benefit where tipper and tippee worked closely together in real estate deals and commonly split commissions on various real estate transactions); *SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000) (finding evidence of personal benefit when

Add. 23

the tipper passed information to a friend who referred others to the tipper for dental work).

Here the "career advice" that Goyal gave Ray, the Dell tipper, was little more than the encouragement one would generally expect of a fellow alumnus or casual acquaintance. *See, e.g.*, J. A. 2080 (offering "minor suggestions" on a resume), J.A. 2082 (offering advice prior to an informational interview). Crucially, Goyal testified that he would have given Ray advice without receiving information because he routinely did so for industry colleagues. Although the Government argues that the jury could have reasonably inferred from the evidence that Ray and Goyal swapped career advice for inside information, Ray himself disavowed that any such *quid pro quo* existed. Further, the evidence showed Goyal began giving Ray "career advice" over a year before Ray began providing any insider information. Tr. 1514. Thus, it would not be possible under the circumstances for a jury in a criminal trial to find beyond a reasonable doubt that Ray received a personal benefit in exchange for the disclosure of confidential information. *See, e.g., United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (evidence must be sufficient to "reasonably infer" guilt).

The evidence of personal benefit was even more scant in the NVIDIA chain. Choi and Lim were merely casual acquaintances. The evidence did not establish a history of loans or personal favors between the two. During cross examination, Lim testified that he did not provide anything of value to Choi in exchange for the information. Tr. 3067-68. Lim further testified that Choi did not know that Lim was trading NVIDIA stock (and in fact for the relevant period Lim did not trade stock), thus undermining any inference that Choi intended to make a "gift" of the profits earned on any transaction based on confidential information.

Add. 24

Even assuming that the scant evidence described above was sufficient to permit the inference of a personal benefit, which we conclude it was not, the Government presented absolutely no testimony or any other evidence that Newman and Chiasson knew that they were trading on information obtained from insiders, or that those insiders received any benefit in exchange for such disclosures, or even that Newman and Chiasson consciously avoided learning of these facts. As discussed above, the Government is required to prove beyond a reasonable doubt that Newman and Chiasson knew that the insiders received a personal benefit in exchange for disclosing confidential information.

It is largely uncontroverted that Chiasson and Newman, and even their analysts, who testified as cooperating witnesses for the Government, knew next to nothing about the insiders and nothing about what, if any, personal benefit had been provided to them. Adondakis said that he did not know what the relationship between the insider and the first-level tippee was, nor was he aware of any personal benefits exchanged for the information, nor did he communicate any such information to Chiasson. Adondakis testified that he merely told Chiasson that Goyal "was talking to someone within Dell," and that a friend of a friend of Tortora's would be getting NVIDIA information. Tr. 1708, 1878. Adondakis further testified that he did not specifically tell Chiasson that the source of the NVIDIA information worked at NVIDIA. Similarly, Tortora testified that, while he was aware Goyal received information from someone at Dell who had access to "overall" financial numbers, he was not aware of the insider's name, or position, or the circumstances of how Goyal obtained the information. Tortora further testified that he did not know whether Choi received a personal benefit for disclosing inside information regarding NVIDIA.

Add. 25

The Government now invites us to conclude that the jury could have found that the appellants knew the insiders disclosed the information "for some personal reason rather than for no reason at all." Gov't Br. 65. But the Supreme Court affirmatively rejected the premise that a tipper who discloses confidential information necessarily does so to receive a personal benefit. *See Dirks*, 463 U.S. at 661-62 ("All disclosures of confidential corporate information are not inconsistent with the duty insiders owe to shareholders"). Moreover, it is inconceivable that a jury could conclude, beyond a reasonable doubt, that Newman and Chiasson were aware of a personal benefit, when Adondakis and Tortora, who were more intimately involved in the insider trading scheme as part of the "corrupt" analyst group, disavowed any such knowledge.

Alternatively, the Government contends that the specificity, timing, and frequency of the updates provided to Newman and Chiasson about Dell and NVIDIA were so "overwhelmingly suspicious" that they warranted various material inferences that could support a guilty verdict. Gov't Br. 65. Newman and Chiasson received four updates on Dell's earnings numbers in the weeks leading up to its August 2008 earnings announcement. Similarly, Newman and Chiasson received multiple updates on NVIDIA's earnings numbers between the close of the quarter and the company's earnings announcement. The Government argues that given the detailed nature and accuracy of these updates, Newman and Chiasson must have known, or deliberately avoided knowing, that the information originated with corporate insiders, *and* that those insiders disclosed the information in exchange for a personal benefit. We disagree.

Even viewed in the light most favorable to the Government, the evidence presented at trial undermined the inference of knowledge in several ways. The evidence established that analysts at hedge funds routinely estimate metrics such as revenue, gross

Add. 26

margin, operating margin, and earnings per share through legitimate financial modeling using publicly available information and educated assumptions about industry and company trends. For example, on cross-examination, cooperating witness Goyal testified that under his financial model on Dell, when he ran the model in January 2008 without any inside information, he calculated May 2008 quarter results of $16.071 billion revenue, 18.5% gross margin, and $0.38 earnings per share. Tr. 1566. These estimates came very close to Dell's reported earnings of $16.077 billion revenue; 18.4% gross margin, and $0.38 earnings per share. Appellants also elicited testimony from the cooperating witnesses and investor relations associates that analysts routinely solicited information from companies in order to check assumptions in their models in advance of earnings announcements. Goyal testified that he frequently spoke to internal relations departments to run his model by them and ask whether his assumptions were "too high or too low" or in the "ball park," which suggests analysts routinely updated numbers in advance of the earnings announcements. Tr. 1511. Ray's supervisor confirmed that investor relations departments routinely assisted analysts with developing their models

Moreover, the evidence established that NVIDIA and Dell's investor relations personnel routinely "leaked" earnings data in advance of quarterly earnings. Appellants introduced examples in which Dell insiders, including the head of Investor Relations, Lynn Tyson, selectively disclosed confidential quarterly financial information arguably similar to the inside information disclosed by Ray and Choi to establish relationships with financial firms who might be in a position to buy Dell's stock. For example, appellants introduced an email Tortora sent Newman summarizing a conversation he had with Tyson in which she suggested "low 12% opex [was] reasonable" for Dell's upcoming quarter and that she

Add. 27

27                                                    Nos. 13-1837-cr; 13-1917-cr

was "fairly confident on [operating margin] and [gross margin]."
Tr. 568:18-581:23.

No reasonable jury could have found beyond a reasonable
doubt that Newman and Chiasson knew, or deliberately avoided
knowing, that the information originated with corporate insiders. In
general, information about a firm's finances could certainly be
sufficiently detailed and proprietary to permit the inference that the
tippee knew that the information came from an inside source. But in
this case, where the financial information is of a nature regularly and
accurately predicted by analyst modeling, and the tippees are
several levels removed from the source, the inference that
defendants knew, or should have known, that the information
originated with a corporate insider is unwarranted.

Moreover, even if detail and specificity could support an
inference as to the *nature* of the source, it cannot, without more,
permit an inference as to that source's improper *motive* for
disclosure. That is especially true here, where the evidence showed
that corporate insiders at Dell and NVIDIA regularly engaged with
analysts and routinely selectively disclosed the same type of
information. Thus, in light of the testimony (much of which was
adduced from the Government's own witnesses) about the accuracy
of the analysts' estimates and the selective disclosures by the
companies themselves, no rational jury would find that the tips were
so overwhelmingly suspicious that Newman and Chiasson either
knew or consciously avoided knowing that the information came
from corporate insiders or that those insiders received any personal
benefit in exchange for the disclosure.

In short, the bare facts in support of the Government's theory
of the case are as consistent with an inference of innocence as one of
guilt. Where the evidence viewed in the light most favorable to the
prosecution gives equal or nearly equal circumstantial support to a

Add. 28

theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt. *See United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002). Because the Government failed to demonstrate that Newman and Chiasson had the intent to commit insider trading, it cannot sustain the convictions on either the substantive insider trading counts or the conspiracy count. *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984) ("[W]here the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute.") (internal quotation marks omitted). Consequently, we reverse Newman and Chiasson's convictions and remand with instructions to dismiss the indictment as it pertains to them.

## CONCLUSION

For the foregoing reasons, we vacate the convictions and remand for the district court to dismiss the indictment with prejudice as it pertains to Newman and Chiasson.